Holly JOHNSON, as Administrator of the Estate of Joseph Henry Fail, deceased, Appellee,

v.

Morgan F. LIVINGSTON, Appellant.

No. 8827.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 21, 1963.

Decided March 13, 1963.

William A. Horger, Orangeburg, S. C. (Horger & Horger, Charlton B. Horger, and Marshall B. Williams, Orangeburg, S. C., on the brief), for appellant.

Henry Hammer and Henry H. Edens, Columbia, S. C. (Edens & Hammer, Columbia, S. C., Julian S. Wolfe, Lofton M. Fanning, and W. T. Klapman, Orangeburg, S. C., on the brief), for appellee.

Before HAYNSWORTH and BRYAN, Circuit Judges, and MICHIE, District Judge.

MICHIE, District Judge.

Appellee's intestate was killed when an automobile in which he was a passenger crashed into a stake-body truck, which had broken down and was being hauled by a pickup truck, and, both vehicles getting out of control, had skidded on the highway and come to a stop blocking the highway to traffic in either direction. The two vehicles belonged to the defendant Morgan F. Livingston and were being driven by the defendants Raymond Barnes and Bradley E. Pou. A truck owned by Reichhold Chemicals, Incorporated and driven by its employee James C. DeLoach, traveling in the opposite direction, had come upon the scene just before the fatal accident occurred but had seen the roadblock in time to stop. Reichhold and DeLoach were also made defendants but the jury found in their favor. It returned a verdict of $15,000.00 against Livingston, Barnes and Pou and judgment was entered thereon.

Only Livingston has appealed and the only issue raised is whether there was sufficient evidence to warrant the jury in holding that Barnes was an agent or

employee of Livingston acting within the scope of his agency or employment at the time of the accident.

Barnes was a sharecropper on Livingston's rather large farm and also had frequently worked for Livingston over a period of approximately ten years. Livingston owned the stake-body truck as well as the pickup truck involved in the accident and Barnes used the stake-body truck in working on Livingston's farm. He was somewhat lame and was frequently allowed at the end of the day to drive the stake-body truck to his home, about three-quarters of a mile away, and to drive it back to Mr. Livingston's house the next morning. He was also occasionally, when he so requested, allowed to drive the truck "to the nearby small town of Livingston, S. C. to get groceries". The pickup truck was used by Mr. Livingston for practically all of his personal driving, leaving an automobile which he also owned for the use of his wife and daughters.

A Mr. Lowther had once employed Mr. Livingston to deliver some poles for him to a fairly distant point and Mr. Livingston had himself carried the poles in the stake-body truck and delivered them. On the morning of the accident Mr. Lowther happened to see Barnes in the stake-body truck and asked him if he would deliver some poles to Ridgeland, South Carolina. Barnes agreed to do so and Lowther paid him $15.00 in advance for doing so. It was understood that Barnes was expected and intended to keep the $15.00.

Barnes picked up the poles and, without advising Livingston of his plans or asking his permission, delivered the poles to Ridgeland and started back toward his home. However the truck broke down on the way back. Barnes then telephoned to Lowther (not Livingston) to report the situation. Lowther drove down to where the truck had broken down and found it parked on a side road. He pulled it further down the side road and off it on the side where he thought it would be safe and left it there and then took Barnes back towards his home telling him that he would bring him back later to get the truck.

Barnes however was worried and insisted that he be taken to Mr. Livingston's as he thought the truck should be gotten back that night. So they drove to Mr. Livingston's and arrived there about midnight. Mr. Livingston was in his pajamas about to go to bed, but he came out on his front porch while Lowther's car was parked at the foot of the steps to the porch.

Barnes told Mr. Livingston what had happened and asked to be allowed to take the pickup truck down to where the stake-body truck had been left and tow the latter back. Mr. Livingston was of course angry as he didn't know that Barnes had taken the truck off on such a trip. Mr. Lowther assured him that the truck was in a safe place and Mr. Livingston then very positively refused to let Barnes take the pickup truck and told him several times not to touch the truck that night—all of which of course was heard by Mr. Lowther.

Mr. Lowther then drove home leaving Barnes at Mr. Livingston's though he was three-quarters of a mile from his home and somewhat of a cripple. Plaintiff makes much of this incident in an attempt to discredit the unanimous testimony of Lowther, Livingston and Barnes as to what in fact took place in the conversation between them which we have just recounted. So it may be as well here to give, from the record, Mr. Lowther's explanation of why he left Barnes at Mr. Livingston's. It follows:

"Q. Why did you leave him there? He didn't want to go home? Or what was the purpose of—

"MR. EDENS: We don't need any more leading.

"THE COURT: He is your witness.

"MR. EDENS: He is doing enough as it is.

"A. Well I offered—I told Raymond I would take him on home. I don't know if it was raining right then much, but it had been raining

severely coming home, don't you know. And I told Barnes that I would take him on home, and he said 'No, no, I have put you to enough trouble, that is all right.' So I left him there in Mr. Morgan's yard. Mr. Morgan had gone back in the house and shut the door * * *

"Q. Do you understand why Barnes stayed there in the front yard instead of letting you drive him home?

"A. Well I didn't think it was very peculiar, because there is another one of his hands that lives in talking distance of Mr. Morgan's house, and I didn't think anything peculiar about it.

"Q. Well you figured that Barnes was going to spend the night in this other house instead of his own home?

"A. I didn't figure that. He just said he wouldn't bother me, and there was a lot of colored houses around there. So I didn't figure anything about it or what he might do. I felt like I had done my job and I didn't feel like—after I had offered to take him home and he refused, why,—

"Q. Well, I say, when you offered. —you say you offered.

"A. I did. I told him I would take him home, which I would have."

After Mr. Lowther left Barnes at Mr. Livingston's Barnes hung around there for about thirty minutes, one may infer to be sure that Mr. Livingston had gone to sleep, and then got in the pickup truck in direct violation of Mr. Livingston's orders and drove to the house of Barnes' son-in-law, Bradley Pou. He told Pou that Mr. Livingston had told him to get Pou, take him down to the location of the stake-body truck and have him steer the stake-body truck while Barnes in the pickup hauled it back to Mr. Livingston's. Barnes testified at the trial, of course, that Livingston had told him no such thing but that he had told Pou that Livingston had in order to

induce Pou to go with him. And Pou did.

With Pou steering the stake-body truck and Barnes driving the pickup they hauled the stake-body truck out of the side road and onto the main road and headed towards Livingston. Just prior to reaching the scene of the accident there is a downgrade and on this grade the stake-body truck "ran up" on the pickup and "fastened to" it and pushed it across the road so that, between the two cars, the main part of the roadway was blocked and in order to pass them, a car would have had to go off the hard surface road onto its shoulders. Barnes and Pou tried to unhook the two trucks but could not do so. DeLoach in the Reichhold truck, came up almost immediately, stopped and tried to help them. But in another moment they heard a car coming, apparently very rapidly, from the opposite direction from which DeLoach had come. So they started in its direction waving flashlights to warn it, DeLoach running and Barnes moving as rapidly as he could. The oncoming car paid no attention to the lights, never checked its speed and crashed into the stake-body truck. Plaintiff's intestate, who was a passenger and asleep, was killed and the other occupants were seriously injured.

■ The foregoing statement of facts speaks for itself. Obviously, if correct, Barnes was not at the time of the accident engaged in carrying out his employer's business but had engaged in a project of his own in direct violation of his employer's orders. It is true that he may have thought that what he was trying to do would be helpful to his employer's interest. But he was doing it in direct violation of his employer's orders. And it is of course well settled that the doctrine of respondeat superior does not apply under such circumstances. Holder v. Haynes (1940), 193 S.C. 176, 7 S.E. 2d 833; 51 A.L.R.2d 128.

In an effort to avoid this result counsel for the plaintiff takes the position that we must disregard the positive testimony of Barnes, Livingston and Lowther with

respect to the orders given by Livingston to Barnes at the midnight conference at Livingston's house. We are to assume, it is argued, that all three of them committed perjury—Barnes because he was an employee of Livingston, Livingston because he is the principal defendant in the suit—and Lowther why? Why, they say, because he is a friend of Livingston. The record hardly bears this out—at least as to any indication that he is such a close friend of Livingston as to be willing to commit perjury to defend him in a lawsuit. The only evidence on the subject is Lowther's testimony as follows:

"Q. You and Mr. Livingston are friends?

"A. Well we are not personal friends. I have only been in Mr. Livingston's house once in my life, and that was to buy a cow. I mean, I am not a personal friend of his. I just know him when I see him and speak to him and so forth, but I mean, I am not acquainted personally with him."

Under these circumstances it is unlikely that Lowther would deliberately commit perjury on Livingston's behalf and as all three participants in the conversation are in precise agreement as to what occurred and there is no evidence to indicate anything to the contrary the jury should have accepted that testimony and we do.

■ The plaintiff makes one more point which deserves brief mention. Sometime within the week before the accident a state highway patrolman had stopped Barnes in the stake-body truck in the little town of Neeses—about two miles from Livingston—because the truck did not have any lights on it. And he had told Barnes to tell Mr. Livingston not to let him have the truck any more at night until it was properly equipped with lights. Barnes never reported this to Mr. Livingston and there is nothing in the evidence to suggest that Mr. Livingston ever permitted Barnes to use the truck at night. If Barnes never reported

the deficiency to Mr. Livingston he can hardly be charged with negligence in failing to have the lights fixed—especially since he had never authorized Barnes to drive the truck at night, though it may at times have been dusk by the time Barnes left work to drive home, three-quarters of a mile away. It follows that this situation cannot be made a basis for support of the verdict and judgment and that they must be set aside and final judgment entered for the defendant Livingston.